**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

BUZZ PHOTOS
2414 W University, Suite 115D
McKinney, Texas 75071

       and

FREEDOM WATCH, Inc.
2020 Pennsylvania Avenue N.W. Suite 345
Washington, D.C. 20006

       and

LARRY KLAYMAN, a Natural Person

       and

Members of the Class and Subclasses and Those Similarly
Situated

                    Plaintiffs,

    v.

THE PEOPLE'S REPUBLIC OF CHINA

       and

THE PEOPLE'S LIBERATION ARMY,
The official military of China

       and

THE WUHAN INSTITUTE OF VIROLOGY,
and agency of the Government of China

       and

SHI ZHENGLI, Director of
the Wuhan Institute of Virology

and

Major General Chen Wei
of China's People's Liberation Army

                            Defendant.

**CLASS ACTION COMPLAINT  CONCERNING MASSIVE DAMAGE CAUSED BY
DEFENDANTS AS A RESULT OF CLOVID-19  RELEASE FROM AN ILLEGAL AND
INTERNATIONALLY OUTLAWED BIOWEAPONS FACILITY IN THE CITY OF
WUHAN OF THE PEOPLE'S REPUBLIC OF CHINA**

In this class action complaint, lead Plaintiffs Buzz Photo, Freedom Watch, Inc., Larry
Klayman putative plaintiffs as members of the class and subclasses and  all persons and entities
similarly situated (collectively "Plaintiffs") sue Defendant the People's Republic of China and
the other Defendants as set forth herein, and show and allege as follows:

I.      **INTRODUCTION AND NATURE OF THE ACTION**

1.  This is a complaint for damages and equitable relief arising out of the creation and
    release, accidental or otherwise, of a variation of coronavirus known as COVID-19 by the
    People's Republic of China and its agencies and officials as a biological weapon in
    violation of China's agreements under international treaties,[1]  and recklessly or otherwise
    allowing its release from the Wuhan Institute of Virology into the city of Wuhan, China,
    in Hubei Province, by among other acts  failing to prevent the Institute's personnel from
    becoming infected with the bioweapon and carrying it into the surrounding community
    and proliferation into the United States.

---

[1]      which in the nature of biological warfare can include discovering a life-threatening virus
or bacteria already existing in nature but then refining, developing, adapting, and/or perfecting it
as a weapon and illegally maintaining a stockpile of the bioweapon.

2. Since biological weapons have been outlawed since at least 1925, including by China's membership in treaties, these illegal weapons constitute and are in effect terrorist-related weapons of mass destruction of population centers.

3. This is a civil action on behalf of the lead Plaintiffs and other members of the class comprised of subclasses identified herein of those directly injured by the spread of COVID-19.

## II.   <u>JURISDICTION AND VENUE</u>

4. This Court has subject matter jurisdiction over this action pursuant to the Justice Against Sponsors of Terrorism Act ("JASTA")  exception 18 **U.S.C.** § 2333.

5. The JASTA exception to the Foreign Sovereign Immunities Act (28 U.S.C. 1602, *et seq.)* incorporates the definition of international terrorism from 8 U.S.C. 2331.

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), (3) and (4), as a civil action brought by citizens of the United States against subjects of a foreign state or foreign state, because there is complete diversity of citizenship between the Plaintiffs and the Defendants in China.

8. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1605 (general exceptions to jurisdictional immunity of a foreign state).

9. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10. This Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

11. Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§ 1391(b)

and 1391(d).

12. **This class action complaint is being brought pursuant to Rule 23 (a) et. seq of the Federal Rules of Civil Procedure.**

III.   **PARTIES AND STANDING**

13. Plaintiff Buzz Photos, which is located in and does and did substantial business in this judicial district, specializes in high school sports photography, serving students, parents, and schools in memorializing school events and promoting family and community involvement in school events.  The interruptions and closings of schools and cancellation of sports events caused by the illegal acts and practices alleged herein by each and every Defendant, jointly and severally, acting in concert as joint tortfeasors, has  shut down and closed Buzz Photos' business and its stands on the verge of bankruptcy.  The company lost about $50,000 over the last weekend alone.   The company has been forced by the COVID-19 epidemic to lay off employees.

14. Plaintiff Freedom Watch, Inc. is a 501(c)(3) non-profit corporation, which depends upon relatively small donations from many individuals.  Freedom Watch has a significant number of its donors who are individuals and entities in Texas and in this judicial district and thus it does substantial business in this district.  The ability to donate is greatly reduced by the economic recession and disruption and economic panic and growing catastrophe caused by the COVID-19 pandemic.

15. Plaintiff Larry Klayman is a citizen of Florida, who is admitted in the U.S. Disrict Court for the Northern District of Texas and he himself does substantial business in this district as a private practitioner.

16. Other putative plaintiffs are  members of the class and its subclasses.

17. The Defendant People's Republic of China ("PRC") is the recognized government of the nation country commonly known as "China."

18. The People's Liberation Army ("PLA") is the official military arm of the PRC.

19. The Wuhan Institute of Virology is a biological laboratory about 20 miles from the center of the city of Wuhan in China, which the Plaintiffs and members of the class and subclasses allege includes an illegal biological weapons laboratory.

20. Shi Zhengli is the Director of the Wuhan Institute of Virology in Wuhan, China.

21. Major General Chen Wei of China's PLA, at the PLA's Academy of Military Medical Sciences,  is the Chinese military's top epidemiologist and virologist, who is not only leading China's responses to the COVID-19 epidemic but also led the creation of the COVID-19 coronavirus as a bioweapon for China's military.

## IV.   <u>CLASS ACTION STATUS</u>

22. Plaintiffs and other members of the class and subclasses will  move the Court to certify this case and its causes of action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"), including sub-classes.

23. FRCP Rule 23(a)(1) requires the lead Plaintiffs to show that "the class is so numerous that joinder of all members is impracticable."

24. FRCP Rule 23(c)(5) provides that "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule."

25. Numerosity should be shown for each proposed class and subclass.  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3rd Cir. 2012). Some courts find that numerosity is typically established when there are at least 40 class members.  *Id.*

26. Rule 23(a)(3) requires the Plaintiffs to show that "the claims or defenses of the

representative parties are typical of the claims or defenses of the class." Plaintiff and the members of the class and subclasses can easily make this and other related showings under FRCP 23 for this suit to qualify as a class action.

27. Sub-class #1 for which the lead plaintiffs seek certification as a class consists of those who have been personally and physically infected  by the COVID-19 virus as an illegal biological weapon, including have already died, or are now suffering damages of sickness, medical costs, disruption of regular activities and life, fear, emotional distress, and direct economic losses.

28. An estimated 3,000 U.S. citizens thus far have been infected with COVID-19 as of March 15, 2020, per the latest report by NBC News, and an estimated 61 have died as of March 15, 2020, according to CBS News, although the delay in widespread testing for the virus renders these numbers understated.

29. Accordingly, joinder of at least over 3,000 persons afflicted with the illness, a class which is rapidly expanding, is not practical.

30. The claims of the lead plaintiffs and of each member of the sub-classes are in substance the result of the same illegal acts and practices of each of the Defendants, acting in concert jointly and severally as joint tortfeasors, differing only in the extent of illness, the amount of medical bills, other expenses, lost income, and other consequences of the illness.

31. Sub-class #2 for which the lead plaintiffs seek certification as a class consists of those who have been injured financially by the severe disruption to the U.S. economy made necessary by efforts to contain and slow the spread of the pandemic.

32. Like named Plaintiffs Freedom Watch, Inc. which depends upon donations from

thousands of typically-small donors from the public from their available funds and discretionary income, millions of employees, individuals working as IRS Form 1099 "contractors," small businesses, large businesses, travel companies and others are suffering dramatic if not catastrophic economic losses from the attempts at isolation and quarantine to contain the spread of the virus.

33. The number of unemployed, under-employed and disrupted small businesses is in the hundreds of thousands and growing rapidly.

34. As just one notable example, Disney World in Orlando, Florida and Universal Orlando have been closed, and many schools and universities.

https://www.dmagazine.com/frontburner/2020/03/a-running-list-of-dallas-cancellations-and-changes-due-to-coronavirus/

35. Ohio and Illinois, among other states and localities, which are increasing minute by minute,  have ordered the closure of all bars and restaurants throughout those States, and other States will quickly follow. Sports events and other public gatherings also also being cancelled and the list is too long to set forth in this Complaint.

36. On Sunday, March 15, 2020, the Centers for Disease Control recommended cancellation of all gatherings of 50 people or more for 8 weeks to slow the spread of the coronavirus pandemic.   Madeline Holcombe and Dakin Andone, "The CDC recommends organizers cancel or postpone events with 50 people or more for 8 weeks," CNN, March 15, 2020, accessible at https://www.cnn.com/2020/03/15/health/us-coronavirus-sunday-updates/index.html

37. On Sunday, March 15, 2020, the Federal Reserve Bank dropped interest rates at which banks may borrow from the Federal Reserve at the so-called "discount window" to 0%,

and launched a massive $700 billion of infusion of money into the financial system.

Steve Liesman, " Federal Reserve cuts rates to zero and launches massive $700 billion

quantitative easing program," CNBC.com, March 15, 2020, accessible at:

https://www.cnbc.com/2020/03/15/federal-reserve-cuts-rates-to-zero-and-launches-

massive-700-billion-quantitative-easing-program.html. For this and other reasons related

to the COVID-19 pandemic,  American stock markets are in a free fall and have already

lost about 30% of their value, which more severe losses expected to continue as part of a

stock market crash.

38. During the day on Monday, March 16, 2020, the Federal Reserve increased its total of

financial support for the financial industry by another $500 billion from $1.5 trillion.

39. Accordingly, joinder of those losing money in the near shut down of parts of our

economy, a class which is rapidly expanding, is not practical.

40. The claims of the lead Plaintiffs and of each member of the class and sub-classes are in

substance all the same, differing only in the amount of lost income, other expenses, lost

income, and other consequences of the medical and  economic disruption.

## V.     FACTS COMMON TO ALL COUNTS

41.     On or about November 15, 1984, China acceded to, ratified, and joined the

**"Convention on the Prohibition of the Development, Production and Stockpiling of**

**Bacteriological (Biological) and Toxin Weapons and on Their Destruction**" (hereinafter the

"Biological Weapons Convention").   See: http://disarmament.un.org/treaties/t/bwc/text

42.     As a member of the treaty, China has legally agreed under international law that

the manufacture, stockpiling, or deployment of  biological weapons are outlawed and illegal.

43.     China has agreed in that treaty that --

Determined, for the sake of all mankind, to exclude completely the possibility of bacteriological (biological) agents and toxins being used as weapons,

Convinced that such use would be repugnant to the conscience of mankind and that no effort should be spared to minimize this risk, Have agreed as follows:

**Article I**
Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:
(1)     microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes;
(2)     weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict.

**Article II**
Each State Party to this Convention undertakes to destroy, or to divert to peaceful purposes, as soon as possible but not later than nine months after the entry into force of the Convention, all agents, toxins, weapons, equipment and means of delivery specified in Article I of the Convention, which are in its possession or under its jurisdiction or control. In implementing the provisions of this Article all necessary safety precautions shall be observed to protect populations and the environment.

**Article III**
Each State Party to this Convention undertakes not to transfer to any recipient whatsoever, directly or indirectly, and not in any way to assist, encourage, or induce any State, group of States or international organisations to manufacture or otherwise acquire any of the agents, toxins, weapons, equipment or means of delivery specified in Article I of the Convention.

**Article IV**
Each State Party to this Convention shall, in accordance with its constitutional processes, take any necessary measures to prohibit and prevent the development, production, stockpiling, acquisition or retention of the agents, toxins, weapons, equipment and means of delivery specified in Article I of the Convention, within the territory of such State, under its jurisdiction or under its control anywhere.

**Article V**
The States Parties to this Convention undertake to consult one another

and to co-operate in solving any problems which may arise in relation to the objective of, or in the application of the provisions of, the Convention. Consultation and co-operation pursuant to this Article may also be undertaken through appropriate international procedures within the framework of the United Nations and in accordance with its Charter.

**Article VI**
(1)     Any State Party to this Convention which finds that any other State Party is acting in breach of obligations deriving from the provisions of the Convention may lodge a complaint with the Security Council of the United Nations. Such a complaint should include all possible evidence confirming its validity, as well as a request for its consideration by the Security Council.
(2)     Each State Party to this Convention undertakes to co-operate in carrying out any investigation which the Security Council may initiate, in accordance with the provisions of the Charter of the United Nations, on the basis of the complaint received by the Council. The Security Council shall inform the States Parties to the Convention of the results of the investigation.

**Article VII**
Each State Party to this Convention undertakes to provide or support assistance, in accordance with the United Nations Charter, to any Party to the Convention which so requests, if the Security Council decides that such Party has been exposed to danger as a result of violation of the Convention.

**Article VIII**
Nothing in this Convention shall be interpreted as in any way limiting or detracting from the obligations assumed by any State under the Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare, signed at Geneva on 17 June 1925.

44. China is also a member of the "**Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare**," signed at Geneva on 17 June 1925 ("Geneva Weapons Convention").

45.     Coronavirus is a grouping of viral diseases which are generally analogous to influenza, but even more harmful and deadly.

46.     Coronavirus variations have been known in years past.

47.     However, on November 17, 2019, a new military weapon variation of coronavirus

was noticed in Wuhan city, in central China's Hubei province, although reporting from government records makes it unclear if it was recognized so early as a new disease. Josephine Ma, " Coronavirus: China's first confirmed Covid-19 case traced back to November 17," South China Morning Post, March 13, 2020, accessible at

https://www.scmp.com/news/china/society/article/3074991/coronavirus-chinas-first-confirmed-covid-19-case-traced-back

48.     This new virus has been designated as COVID-19 or SARS-CoV-2.

49.     The first case confirmed to be COVID-19 infection is admitted to be on December 8, 2019.  *Id.*

50.     However, doctors in Wuhan and throughout China "were also ordered not to disclose any information about the new disease to the public."  *Id.*

51.     COVID-19 is an extremely dangerous disease, because it has an extremely aggressive nature, was designed to mutate from person to person, spreads very quickly and easily, no vaccine exists yet on account of it being a new disease, the means of transmission are not fully known with certainty, and treatments are only just being worked out, and the disease appears to be about ten times as deadly as the flu.

52.     COVID-19 was designed by China to be a very "effective" and catastrophic biological warfare weapon to kill mass populations.

53.     Studies from scientists at Princeton University undergoing peer review show that COVID-19 can survive in the air for up to three hours and be transmitted in the air and can survive on inanimate surfaces for up to three days.  See:  John Bowden, "Tests Indicate Coronavirus Can Survive in the Air," The Hill, March 11, 2020, accessible at:

https://thehill.com/policy/healthcare/487110-tests-indicate-coronavirus-can-survive-in-the-air

54.     This makes COVID-19 a very unusual and dangerous virus, seemingly hand-crafted to spread rapidly through multiple pathways.

55.     Meanwhile, there are many indications besides the nature of the disease demonstrating that the virus was engineered in the Chinese military's laboratory or laboratories

56.     In publicly and officially speaking about efforts in China to respond to COVID-19, Chinese leader Xi Jinping specifically linked efforts to prevent similar future threats to security of biological laboratories.   Xi explained these efforts by saying that laboratory safety is a "national security" issue.  See:  Steven Mosher, "Don't buy China's story: The coronavirus may have leaked from a lab," New York Post, February 22, 2020, accessible at:

https://nypost.com/2020/02/22/dont-buy-chinas-story-the-coronavirus-may-have-leaked-from-a-lab/

57.     The very next day, the Chinese Ministry of Science and Technology released a new directive titled: "Instructions on strengthening biosecurity management in microbiology labs that handle advanced viruses like the novel coronavirus."   *Id.*

58.     Thus, China's military and national leadership clearly linked the origins and spread of COVID-19 with safety protocols and containment at China's biomedical microbiology laboratories.

59.     The New York Post in a piece by Steven Mosher further reveals:

> "It sure sounds like China has a problem keeping dangerous pathogens in test tubes where they belong, doesn't it? And just how many "microbiology labs" are there in China that handle "advanced viruses like the novel coronavirus"?
>
> It turns out that in all of China, there is only one. And this one is located in the Chinese city of Wuhan that just happens to be … the epicenter of the epidemic.
>
> That's right. China's only Level 4 microbiology lab that is equipped to

handle deadly coronaviruses, called the National Biosafety Laboratory, is part of the Wuhan Institute of Virology.

*Id.*

60.     Thus, although China's government -- which has power over all of China's society and has always been opaque and non-forthcoming  to other nations – has admittedly in  official statements linked the viral epidemic that broke out in Wuhan with the need to strengthen safety protocols and security measures at the microbiology laboratory in Wuhan in Hubei Province.

61.     The Wuhan Institute of Virology is used for China's illegal biological warfare weapons programs, according to experts:

> "Dany Shoham, a former Israeli military intelligence officer who has studied Chinese biological warfare, said the institute is linked to Beijing's covert bio-weapons program.
>                   * * *
> "China has denied having any offensive biological weapons, but a State Department report last year revealed suspicions of covert biological warfare work.
>                   * * *
> "Asked whether the new coronavirus may have leaked, Mr. Shoham said: "In principle, outward virus infiltration might take place either as leakage or as an indoor unnoticed infection of a person that normally went out of the concerned facility. This could have been the case with the Wuhan Institute of Virology, but so far there isn't evidence or indication for such incident.

Bill Gertz, The Washington Times, January 26, 2020, accessible at https://www.washingtontimes.com/news/2020/jan/26/coronavirus-link-china-biowarfare-program-possible/

> The former Israeli military intelligence doctor also said suspicions were raised about the Wuhan Institute of Virology when a group of Chinese virologists working in Canada improperly sent to China samples of what he described as some of the deadliest viruses on earth, including the Ebola virus.
>
> In a July article in the journal Institute for Defense Studies and Analyses, Mr. Shoham said the Wuhan institute was one of four Chinese laboratories engaged in some aspects of biological weapons development.

He said the secure Wuhan National Biosafety Laboratory at the institute was engaged in research on the Ebola, Nipah and Crimean-Congo hemorrhagic fever viruses.

The Wuhan virology institute is under the Chinese Academy of Sciences, but certain laboratories within it "have linkage with the PLA or BW-related elements within the Chinese defense establishment," he said.

* * *

The Wuhan Institute of Biological Products is a civilian facility but is linked to the Chinese defense establishment. Mr. Shoham said it is thought to be involved in the Chinese Biological Weapons Convention program. China's vaccine against SARS is probably produced there.

*Id.*

"Mr. Shoham holds a doctorate in medical microbiology. From 1970 to 1991 he was a senior analyst with Israeli military intelligence for biological and chemical warfare in the Middle East and worldwide, holding the rank of lieutenant colonel.

* * *

Asked if the new coronavirus may have leaked, Mr. Shoham said: "In principle, outward virus infiltration might take place either as leakage or as an indoor unnoticed infection of a person that normally went out of the concerned facility. This could have been the case with the Wuhan Institute of Virology, but so far there isn't evidence or indication for such incident."

Bill Gertz, The Washington Times, January 24, 2020, accessible at https://www.washingtontimes.com/news/2020/jan/24/virus-hit-wuhan-has-two-laboratories-linked-chines/

62.    Many reputable people and organizations and experts have thus come to the

conclusion that this crisis began when a Chinese biological weapons facility accidentally

released the COVID-19 virus into the atmosphere. An opinion column in The Hill states:

"The conventional, and mostly likely, view of the COVID-19 outbreak is that it originated in Wuhan, China, near the most sophisticated Chinese bioweapons lab and then proceeded into the world from there, leaving people to guess whether it originated in the lab and leaked, came from wild bats or snakes, or came from exotic meat market .

Grady Means, "The coronavirus: Blueprint for bioterrorism," The Hill, March 9, 2020, accessible

at https://thehill.com/opinion/national-security/485921-the-coronavirus-blueprint-for-bioterrorism

63.    It has been reported that:

> "The very first patient identified had *not* been exposed to the market, suggesting the virus may have originated elsewhere and been transported to the market, where it was able to thrive or jump from human to animal and back again."

Jackson Ryan,  "Coronavirus and COVID-19: All your questions answered," Cnet.com, March 11, 2020,  section "Where did the virus come from," accessible at https://www.cnet.com/how-to/coronavirus-and-covid-19-all-your-questions-answered/#wherefrom  *(emphasis in original).*

*See, also,* Prof Chaolin Huang, MD, Yeming Wang, MD, Prof Xingwang Li, MD, Prof Lili Ren, PhD, Prof Jianping Zhao, MD, Yi Hu, MD, et al., "Clinical features of patients infected with 2019 novel coronavirus in Wuhan, China," THE LANCET, Volume 395, Issue 10223, February 15, 2020, accessible at:  https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30183-5/fulltext#seccestitle170

64.    Those, including doctors and researchers, trying to spread the word in China about the new COVID-19 disease were arrested or "disappeared."

65.    Dr. Li Wenliang of Wuhan finally violated Chinese censorship and raised the alarm to the outside world internationally through a chat room of his classmates on December 30, 2019.

66.    Dr. Li was then summoned by authorities in China, reprimanded, and silenced.

67.    Speaking to the New York Times, he explained:  "If the officials had disclosed information about the epidemic earlier," Dr. Li told The Times."I think it would have been a lot better. There should be more openness and transparency."

68.    On February 6, 2020, Dr. Li then, not coincidentally, died of the very disease he was working to fight.

69.    Major General Chen Wei of China's PLA, of the PLA's Academy of Military Medical Sciences,  played a leading role within China of fighting the SARS outbreak in 2003-

2003, and to fight Ebola including developing a vaccine for Ebola in 2014.

70.     Nevertheless, these efforts to minimize the damage caused for fighting disease within the Chinese military also provided Chen with expertise in recognizing, devising, and stockpiling for China's military the most effective bioweapons.

71.     Indeed, curiously, in the attempt to put the COVID-19 disease "back in the bottle" Major Gen. Chen injected herself and six members of her staff with a potential vaccine which had not yet been tested on animals.  David Gilbert, "A Chinese Doctor Injected Herself with an Untested Coronavirus,"  Vice, March 4, 2020, accessible at:

https://www.vice.com/en_us/article/v74p5y/a-chinese-doctor-injected-herself-with-an-untested-coronavirus-vaccine

72.     Thus, through the  use of a possible vaccine on herself, Major Gen. Chen's actions are consistent with  desperation and  her and her nation's guilt that the Chinese military and all of the Defendants, acting in concert, jointly and severally as joint tortfeasors, caused this burgeoning national and world catastrophe.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*AIDING AND ABETTING THE RISK OF DEATH OR*
*SERIOUS BODILY INJURIES TO UNITED STATES CITIZENS  AND MEMBERS OF*
*THE CLASS AND SUBCLASSES IN VIOLATION*
*OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c) AND 18 U.S.C. § 2333*

73. Plaintiffs and the other members of the class and subclasses repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

74. By the acts alleged herein, Defendants, each and every one of them, jointly and severally as joint tortfeasors, are committing and/or aiding and abetting and conspiring to help the commission of acts of international terrorism.

75. Each of the Defendants provides substantial assistance to acts of terrorism in violation of 18 U.S.C. § 2332 and 18 U.S.C. § 2332a.

76. Each of the Defendants knows, or has recklessly disregarded, that it is providing material support to what is in effect constitutes international terrorism.

77. By aiding and abetting violations of 18 U.S.C. § 2332 that have caused harm as pled herein and at a minimum placed each of the Plaintiffs in imminent danger in his or her person, property, and/or business.

78. Defendants are jointly and severally liable as joint tortfeasors pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiff(s) have sustained as a result of such injuries.

### SECOND CAUSE OF ACTION
*PROVISION OF MATERIAL SUPPORT TO TERRORISTS*
*IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333*

79. Plaintiffs and each of the members of the class and subclasses repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

80. Each of the Defendants, each and every one of them acting in concert as joint tortfeasors is providing material support to the preparation and carrying out of numerous acts of what in effect constitutes international terrorism which have placed the Plaintiff(s) in imminent danger of death or illness.

81. By participating in the commission of violations of 18 U.S.C. § 2339A that have caused each of the Plaintiffs to be injured in his or her person, business or property, Defendants are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs and the class and subclasses have sustained as a result of the actions pled herein.

82. As a result of such support to terrorist groups, Defendants violated the law of nations, established U.S. law, international laws, treaties and norms, including but not limited to those sections previously set forth: The Declaration on Measures to Eliminate International Terrorism and citations therein incorporated by reference adopted by the United Nations General Assembly on December 9, 1994 (GA Res. 49/50); The Anti-Terror Act, 18 U.S.C. 113B; The Anti-Terrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996); The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act"), Pub. L. No. 107-56, 115 Stat. 271 (2001); The Convention on the Prevention and Punishment of the Crime of Genocide; Art. 2, December 9, 1949, 78 UNTS; International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M. 270 (Dec. 9, 1997); G.A. Res. 54/109, 1 UN Doc A/RES/54/109 (Dec. 1, 1999) and ratified by over 130 countries (The Financing Convention); United Nations Charter, 59 State. 1031, 3 Bevans 1153 (1945); Universal Declaration of Human Rights, G.A. Res. 217A (iii), U.N. Doc. A/810 (1948); International Covenant on Civil and Political Rights, G.A. Res. 2222A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52 U.N. Doc. A 6316 (1966); Common Article 3 of the 1949 Geneva Convention; Article 4 and 13 of the 1997 Geneva Protocol II; Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, 37 I.L.M. 1(Dec. 18, 1997); and other fundamental principles.

### THIRD CAUSE OF ACTION
***CONSPIRACY TO CAUSE INJURY AND EVEN DEATH OF U.S. CITIZENS AND MEMBERS OF THE CLASS AND SUBCLASSES IN VIOLATION OF 18 U.S.C. §§ 2332(b) and 2333***

83. Plaintiffs and each of the members of the class and subclasses repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

84. Although it appears that the COVID-19 virus was released at an unplanned, unexpected time, it was prepared and stockpiled as a biological weapon to be used against China's perceived enemies, including but not limited to the people of the United States.

85. While COVID-19 virus may be too slow acting and slow-spreading to be used quickly against an enemy's military, it was designed to be used agaist the general population of one or more of China's perceived enemy nations, such as the United States.

86. Thus, the Defendants, each and every one of them acting in concert jointly and severally as joint tortfeasors, created and/or refined and then stockpiled biological weapons for the express purpose of using such weapons against its perceived enemies, including but not limited to the people of the United States.

87. The Defendants, each and every one of them acting in concert jointly and severally as joint tortfeasors, acted and/or conspired to harm U.S. citizens using these biological weapons.

88. Because China has agreed by treaty to outlaw such weapons, these actions cannot be official governmental actions of the People's Republic of China and are not subject to any possible claim of legal immunity from suit.

89. Although the actual release of the COVID-19 bioweapon appears to have been unintentional and not intended to be released in the laboratory's backyard, the purpose

of maintaining the virus within the laboratory was to use it to kill U.S. citizens and other persons and entities in nations perceived to be an enemy of China.

90. The Defendants thus attempted to and did harm U.S. citizens in violation of 18 U.S.C. § 1113.

91. Each of the Plaintiffs and members of the class and subclasses have, at a minimum, also been placed in imminent danger in his person, property or business as prohibited by 18 U.S.C. § 2332 and 18 U.S.C. § 2332a.

92. The acts of terrorism at issue are extreme and outrageous and committed to cause extreme physical pain and suffering, and financial loss to Plaintiffs and members of the class and subclasses.

93. Defendants agreed, including by implication or common understanding, to combine with each other, their agents, and other persons to act unlawfully, in the manner set forth in this Complaint and committed overt acts in furtherance of the conspiracy.

94. At all relevant times, Defendants, each and every one of them acting in concert as joint tortfeasors, jointly and severally, knew of this conspiracy and knew and knows, in particular, of the roles of charitable front organizations and their leaders in furtherance of that conspiracy

95. At a minimum, Defendants recklessly disregarded the nature and purposes of the conspiracy.

96. Defendants knowingly and purposefully agreed to perform the acts complained of herein with the knowledge, and for the purpose, that such services facilitate their mutual goals and support what are in effect and thus constitute terrorist activities pursuant to a common scheme to encourage and incentivize acts of terrorism.

97. By conspiring to support, encourage and facilitate violations of 18 U.S.C. § 2332 that have injured each plaintiff's respective person, property, or business, Defendants, each and every one of them,  jointly and severally as joint tortfeasors, are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs and members of the class and subclasses have sustained as a result of such injuries.

98. By encouraging and facilitating violations of and 18 U.S.C. § 2332a that have injured each of the lead Plaintiffs the class and subclasses in their person, property, employment or businesses, and Defendants, each and every one of them, are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs and the members of the class and subclasses have sustained as a result of such illegal acts.

## FOURTH  CAUSE OF ACTION
### NEGLIGENCE

99. Plaintiffs and each of the members of the class and subclasses repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

100.    Each of the Defendants, each and every one  of them acting in concert jointly and severally as joint tortfeasors, owe a duty under the conventions and thus Plaintiffs and members of the class and subclasses outlawing biological weapons to assertively destroy biological weapons as well as to refrain from creating or stockpiling them and to report to the other treaty members all known facts to avoid the spread or release of biological weapons.

101.    The inherent act of creating, refining, and/or maintaining supplies of COVID-19 was illegal and banned under the terms of the treaties China has acceded to.

102.    Each of the Defendants each and every one of them jointly and severally as joint tortfeasors owed a duty of ordinary care to handle outlawed and illegal biological

weapons which are inherently extremely dangerous materials with the care needed to avoid the foreseeable, natural, inevitable deadly consequences of those inherently dangerous materials nearly certain to foreseeably cause loss of human life and severe injuries at a minimum.

103.    In violation of the Defendant's duty of care, the Defendants recklessly, wantonly, willfully created an unreasonable risk of death and dangerous illness toward Plaintiffs and other members of the class and subclasses by failing to maintain banned and unlawful bioweapons with adequate protections and safeguards against their accidental release.

104.    In violation of each of the Defendant's duty of care, acting in concert jointly and severally as joint tortfeasors, each of the Defendants allowed the COVID-19 virus to escape from a laboratory in or near Wuhan, China, which  is the Wuhan Institute of Virology, or a sub-component thereof.

105.    As a direct and proximate consequence of Defendants', each and every one of them acting in concert jointly and severally as joint tortfeasors, wanton and irresponsible recklessness and negligence, the public release and spread of COVID-19 has caused the Plaintiffs and other members of the class and subclasses illness, death, medical expenses, economic disruption and damage, loss of employment  and other great losses including but not limited to loss of time for their chosen lives, and social disruption.

**FIFTH CAUSE OF ACTION**
**WRONGFUL DEATH**

106.    Plaintiffs and members of the class and subclasses repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

107.    The Defendants, each and every one of them, jointly and severally as joint tortfeasors, are responsible for the deaths of at least 41 U.S. citizens, and mounting, and others in the class from COVID-19 viral infections.

108.    By reason of the wrongful conduct of Defendants, Plaintiffs, on behalf of themselves and their family and Plaintiffs' and members of the class and subclasses, and their decedents, suffered conscious pain, suffering, severe emotional distress and death, and have suffered pecuniary and economic damage, loss of support, loss of nurture, care and guidance, grief, anguish, loss of services, loss of society, and other mental and physical injuries and even death.

**SIXTH CAUSE OF ACTION**
**ASSAULT AND BATTERY**

109.    Plaintiffs and members of the class and subclasses repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

110.    The Defendants, each and every one of them, jointly and severally as joint tortfeasors, have caused physical damage and harm to the members of the class and subclasses, particulary in subclass #1 and subclass #2, by physically infected the bodies of the class members.

111.    The Defendants, each and every one of them, jointly and severally, have also placed all members of sub-class #1 and sub-class #2 in reasonable fear of imminent harm and/or death.

112.    By reason of the wrongful conduct of Defendants, Plaintiffs and members of the

class and subclasses suffered conscious pain, suffering, severe emotional distress and

the fear of imminent serious bodily injury or death, and death, and have suffered

pecuniary and economic damage, loss of support, loss of nurture, care and guidance,

grief, anguish, loss of services, loss of society, and other mental and physical injuries.

## PRAYER FOR RELIEF

Plaintiffs demand that judgment, after a jury trial, be entered against Defendants each and

every one of them, jointly and severally as joint tortfeasors, for compensatory and actual

damages because of their demonstrable physical and emotional injury to Plaintiffs and the class

and subclases, punitive damages because of Defendants callous and reckless indifference and

malicious acts, and attorneys fees, costs, an award in excess of $20 trillion U.S. Dollars and such

other relief the Court may deem just and proper.

## JURY DEMAND

Plaintiffs respectfully demand a jury trial on all issues so triable.


Dated:   March 17, 2020

                                        Respectfully submitted,
                                        */s/ Larry Klayman*
                                        Larry Klayman, Esq.
                                        A Member of this Court's Bar
                                        Freedom Watch, Inc.
                                        2020 Pennsylvania Avenue N.W.
                                        Suite 345
                                        Washington, D.C. 20006
                                        (561) 558-5336
                                        leklayman@gmail.com

                                        Attorney for Plaintiffs on behalf of himself
                                        and Other Members of the Class and
                                        Subclasses